Alfred D. MITTENDORF, Jr., Plaintiff,

v.

J. R. WILLISTON & BEANE INCORPO-
RATED et al., Defendants.

No. 73 Civ. 3286 (MP).

United States District Court,
S. D. New York.

March 11, 1974.

Casey, Lane & Mittendorf, New York City, for plaintiff; by Preben Jensen, Charles M. Pratt, John T. Morin, New York City.

Shea, Gould, Climenko & Kramer, New York City, for defendant J. R. Williston & Beane, Inc., by Martin I. Shelton, New York City.

Sullivan & Cromwell, New York City, for defendant Alpheus C. Beane, by William R. Norfolk, New York City.

Colton, Weissberg, Hartnick & Yamin, New York City, for defendant Marvin D. Kantor; by Alan J. Hartnick, New York City.

Baer & Marks, New York City, for defendants Frederick S. Todman & Co. and Frederick S. Todman; by George H. Colin, Gerald S. Maltz, New York City.

## OPINION

POLLACK, District Judge.

This claim is made under Section 10(b) of the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78j(b), and Rule 10b–5 of the Rules promulgated thereunder, 17 C.F.R. § 240.10b–5. Common law allegations are added as claims pendent to the federal question jurisdiction.

### I.

The plaintiff instituted this suit on July 26, 1973, seeking damages from the defendants in respect to a subordinated loan made by the plaintiff on August 9, 1963 to defendant Williston & Beane, Inc. (W&B hereafter). The loan consisted of common stocks owned by plaintiff which were then worth $103,000; the loan carried interest at 4% per annum. The return of the securities was subordinated in interest to obligations of the firm due to its general creditors. By the terms of the loan plaintiff was entitled to continue to receive any dividends payable on the stocks and was privileged to trade the stocks and substitute others. Around the same period of time W&B added to its senior capital by obtaining other loans, likewise subordinated to obligations payable to general creditors.

Due to circumstances to be related hereafter, W&B went out of business on December 1, 1963 and commenced marshalling and liquidating its assets and paying off its creditors; the liquidation is still incomplete. In the interim all general creditors and others entitled to priority over the plaintiff's class of subordinated lenders have obtained satisfaction of their claims against W&B. However, the subordinated loans mentioned have been only partially satisfied

to date. A final liquidating distribution is expected to be made in the near future but some deficiency will remain unsatisfied on these subordinated loans. Plaintiff claims that W&B still owes him 91 shares of the stock of Congress Fund which he loaned in August 1963 as well as $82,718.67 which represents the proceeds of some stock loaned in 1963 and sold in 1966 by W&B to pay an indebtedness from W&B to bank (general) creditors.

Plaintiff seeks by this case, in effect, to undo his August 1963 loan and to recover damages thereon from W&B and its principal officers, and accountants, claiming that at the time of the loan these defendants failed to disclose information concerning W&B to which he was entitled to properly evaluate the investment he was then making in W&B.

The defendants severally deny plaintiff's allegations and deny liability to the plaintiff. They affirmatively assert, among other things, that in June 1968 plaintiff executed and delivered a general release in favor of the corporate defendant and the defendant-officers and directors thereof, concluding an attempt on behalf of plaintiff to obtain a general creditor's status and precluding any further criticism of the said defendants in respect to the customer's account which underlies this case. Defendants also assert that the claims herein are barred by the applicable statutes of limitation.

The case was tried to the Court, without a jury, and decision was reserved after the parties rested.

If plaintiff is entitled to a recovery herein against W&B he would become entitled to a priority in the distribution of the remaining assets of W&B; this might give him substantially all of the assets remaining in the liquidation instead of only his aliquot share thereof as one of the subordinated creditors. Speaking of the release which he furnished to W&B five and a half years

ago, he testified that he thought he was settling the whole matter at that time.

However, plaintiff was recently advised to bring this suit. He testified that he had believed that things were coming along all right for him in the liquidation. As the liquidation neared final distribution, it seemed to the plaintiff that there would be a shortfall in the recovery on his loan. Meanwhile, a Court decision made on May 1, 1972 in favor of one Maher against the defendant Beane came to the attention of plaintiff. Maher, a former employee of W&B, had bought some of the W&B stock in 1963 and he charged that the sale was induced by misrepresentations. In the course of the Court's opinion, a letter from W&B's accountant, Todman, dated January 8, 1963 was recited in part. Although plaintiff never saw the letter and Mr. Henry never actually ever read it, this was pointed to as having generated this suit.

For the reasons shown hereafter, under all the relevant facts and circumstances, there is neither merit, equity or vitality in the claims asserted. There is no doubt that before the plaintiff executed and delivered the settlement agreement and general release in 1968, negotiated by his attorneys, he was sufficiently informed of the material facts connected with and arising out of the matters underlying the claims herein as to which the so-called Todman letter of January 8, 1963 is only a further detail. That general release and settlement were intended to cover and conclude claims of the sort made herein and are a bar to them. Moreover, the limitary period for commencement of this suit, even if a fraud statute were to be applied, expired before suit was filed.

There was no factual or legal justification for the inclusion as defendants in this suit of the accountants, Frederick Todman & Co.[1] or Messrs. Beane and Kantor. There was neither conspiracy to commit any wrong nor control or

---

[1] Frederick S. Todman has died since the trial and his Estate has been substituted as a party defendant.

direction of Norman J. Marsh who conducted the transaction on behalf of the plaintiff and of W&B Inc. Indeed none of the individual defendants were personally aware of the August 1963 transaction made by plaintiff until a time subsequent thereto. There was no transaction with or reliance by plaintiff, either in fact or law, on the individual defendants.

## II.

In more detail, the facts are as follows.

Williston & Beane, a stock and commodity brokerage partnership, incorporated its business on May 24, 1963. One of its customers with whom the firm had done business since 1958, Allied Crude Vegetable Oil and Refining Co. ("Allied" hereafter) carried contracts for commodities futures in cottonseed and soy bean oil, and a spot account in the commodity, both accounts being carried on margined loans. In November 1963 the market price of futures contracts declined sharply and Allied was called for additional deposits of margin of about $600,000. It failed to respond and on November 19, 1963, Allied filed in bankruptcy. The following day W&B liquidated Allied's position in accordance with directions of the New York Produce Exchange. This resulted in a deficit due the brokers of $1,200,000.

The Allied accounts were collateralized by warehouse receipts for soy bean oil believed to be worth about $1,800,000., issued by a subsidiary of American Express Company, the American Express Field Warehousing Corp., as well as by six-figure equities existing in Allied's spot commodity account. However, the sudden impact on the W&B capital account by the cash deficit in its customer's futures account caused the New York Stock Exchange and allied exchanges on November 20, 1963 to temporarily suspend W&B's memberships. W&B promptly raised additional capital and was reinstated on the Exchanges on November 22, 1963. Shortly thereafter the business and customers' accounts of W&B were transferred to another brokerage firm, Walston & Co., and W&B went into liquidation on December 1, 1963.

The ostensibly adequate collateral securing the Allied futures account turned out to be fictitious—in fact there was no oil represented by the warehouse receipts therefor. This was the famous "Salad Oil" swindle which was shortly uncovered resulting in a widespread chain of losses and disasters to firms in the Street and in criminal proceedings which sent the principal perpetrator, Tino De Angelis, to prison from which he emerged on parole about a year and a half ago after serving seven years of a 20 year sentence on a guilty plea.[2]

## III.

The plaintiff's relationship with W&B so far as material here was as follows. Plaintiff was a long time stock brokerage customer of the partnership predecessor of W&B and had maintained his business with them through his personal friend and advisor, Norman J. Marsh. Marsh was a general partner in the predecessor of W&B and on its incorporation became one of the senior vice-presidents as well as an 11% stockholder therein and he and his wife contributed to the capital of W&B as subordinated lenders. Marsh had been the co-executor of the estate of plaintiff's mother. When plaintiff was overseas from 1944 to 1954 Marsh exercised complete discretion over plaintiff's investments. From

**2.** Some of the aspects of the debacle were recalled recently in the Wall Street Journal, January 15, 1974, as "one of the greatest frauds in history. When his [De Angelis] Allied Crude Vegetable Oil & Refining Co. and related concerns collapsed in bankruptcy in 1963, investigators found empty storage tanks where they were supposed to find 1.8 billion pounds of salad oil that Tino [De Angelis] had already sold or hocked. Two major companies were wiped out; the brokerage firm Ira Haupt & Co. and American Express Field Warehousing Corp., a subsidiary of American Express Co., and the losses reverberated throughout the financial world."

1954 until Marsh's illness in 1968, while plaintiff was located in Washington, Marsh would check with him on the transactions made on his behalf. After W&B went into liquidation, Marsh became associated successively with Walston & Co. and then Gude, Winmill & Co. and the plaintiff's account went with Marsh and was handled by him at each firm.

The plaintiff made two subordinated loans to W&B, one already mentioned, that of August 9, 1963, shortly after W&B was incorporated, and a second and larger subordinated loan of securities on or about November 22, 1963 on the occasion of the business difficulty described above. To meet its need to replenish its capital in the November circumstances W&B obtained a number of subordinated loans in addition to the one made by plaintiff. Although this suit was filed by plaintiff to recover in respect of both the August and November loans, the proof established that the second loan has been fully satisfied and consequently the claim thereon has now been abandoned. The November loans obtained by W&B were entitled to and accorded priority over loans made earlier and the loans of the November lenders have all been satisfied in the liquidation proceedings. Nonetheless, the circumstances under which plaintiff made the November loan and plaintiff's knowledge thereof bear on the questions raised by the defenses of settlement and release and of the statutes of limitation and will be referred to again.

The initial subordinated loan by plaintiff was supplied in a period when W&B had been considering the expansion of its equity capital base. Its business had weathered the sudden economic storm which had occurred in mid-1962. In 1963, the firm was back on a profitable keel and was engaged in discussions with Clements Evans & Co. of Atlanta with a view to bring them into the firm to effect a desired expansion of equity capital. Initially, therefore, the firm was not interested in any further senior capital. It believed that it had suffi-cient senior obligations in the shape of subordinated loans from its principal officers and members of their families, including, as already stated, Norman J. Marsh and his wife.

In August 1963 Marsh told plaintiff that W&B was seeking capital for expansion and that he was lending some of his own securities to the firm on an interest bearing basis, subordinated to general creditors. Marsh suggested that plaintiff could do the same if he desired to increase his income. Dividends on the securities would continue to be payable to the lender who also would be free to trade the securities deposited and substitute other securities. It was clear and plaintiff understood that there was a risk involved similar to that in any investment in a good stock exchange firm. *Non constat*, plaintiff testified that he considered himself fortunate to be able to have this opportunity. A list of stocks worth $103,000 was drawn up and they were loaned to W&B pursuant to a subordinated loan agreement which plaintiff signed. Not too long thereafter plaintiff volunteered to Marsh that he liked the idea of such an arrangement and he offered to increase his loan by deposit of additional stocks, but Marsh told plaintiff that the opportunity to do so was not available at that time.

Except to say that W&B was expanding and was a very good firm and up and coming, Marsh did not, in connection with the loan, discuss with Mittendorf the business or the customers' accounts of the firm and Mittendorf asked no questions and neither requested nor received any financial data on W&B.

Matters stood in this posture until the storm, created by the Allied account, burst in November 1963. Following the suspension of the firm by the Stock Exchange and the need for an immediate infusion of new capital to go back on the Exchange, Marsh communicated with plaintiff and asked him if he was still interested in increasing his subordinated loan and, finding him receptive, Marsh suggested that the securities be loaned

to him and in turn to W&B on a subordinated loan basis which plaintiff was willing to do. Marsh told W&B that he was increasing his own subordinated capital contribution. Plaintiff sent Marsh a telegram, worded by Marsh, authorizing the loan to the latter of securities valued at $230,000. Two days later, after again conferring with Marsh, the transaction was changed to a direct loan from plaintiff to W&B, subordinated in interest to its general creditors. Plaintiff admitted that he put up these securities as a subordinated lender after he knew that W&B had been suspended and was in financial trouble and that he understood that he was thereby bolstering its finances.

As indicated above, plaintiff has acknowledged at the trial and in his post trial brief that all of the obligations due him on the November loan have been satisfied (parenthetically, his securities were worth over $300,000 when returned). Consequently, it is unnecessary to go into and resolve the conflicts in the evidence or the issue of credibility with respect to what was or was not disclosed to plaintiff in respect to this later investment or what and when plaintiff learned about the salad oil scandal and its impact on W&B, other than to note the following.

Plaintiff admitted that he learned of Allied's commodity account carried by W&B; that an investigation of the tanks to which W&B looked for security disclosed that the oil was missing from there; that he learned that W&B had suffered a loss in the magnitude of $1,000,000.; but that this did not concern him because American Express was involved in it—by which he meant that W&B was secured against the loss by American Express; and that American Express would take care of its mistake. (American Express ultimately did make good to W&B on the warehouse receipts, to the tune of $1.7 million).

Plaintiff realized his role in November from the letter of Marsh to him reciting the "help you gave us during our most acute hour. We shall never forget it. Thanks very much."

The aftermath of the debacle was that Norman Marsh got in touch with Mittendorf's lawyer, Ryder Henry, Esq. a member of the law firm appearing here for plaintiff. Mr. Henry represented plaintiff in his affairs with W&B, during the liquidation, with the assistance of Marsh. Plaintiff left his interests entirely in their hands and received their reports thereon over the intervening years. Plaintiff was made aware of the facts that a subordinated lender and a stockholder had sued W&B, charging impropriety in handling the firm's business and Allied's accounts and in permitting them to be maintained on worthless warehouse receipts deposited as collateral.

On cross examination at the trial plaintiff averred that he had relied completely on Marsh in making the loans; that he had no thought of suing Marsh because he didn't think Marsh was at fault; that Marsh was not dishonest in any way; and that Marsh had arranged the loans in the service of Mittendorf's best interests. Plaintiff's attorney however took a different tack during the liquidation.

In 1966 Mr. Henry demanded and obtained an agreement from W&B tolling the period of limitations for one year, within which to bring suit on plaintiff's behalf against W&B. The preamble thereof states that Mittendorf was claiming to be entitled to recover from W&B the securities that had been loaned in August and November 1963 and to receive damages by reason of the subordinated loans. Mr. Henry by such gestures was seeking during this period to obtain a creditor's priority for Mittendorf's total investment.

Ultimately in 1968, the parties entered into a settlement agreement referring to the litigation and threat of litigation against W&B by subordinated lenders. The agreement contained a general release from plaintiff to W&B and to every one of its officers and directors except Beane, who received a separate gen-

eral release a short time later. Plaintiff candidly admitted that he thought he was settling the whole matter at that time. The facts and circumstances as found by this Court confirm that he did settle and release the claims here asserted and intended to do so on sufficient notice and knowledge of his rights.

## IV.

The August 1963 subordinated loan is attacked on the ground that material facts to which plaintiff was entitled, bearing on an evaluation of his investment, were not disclosed to the plaintiff, but were intentionally concealed.[3] Plaintiff testified that he doesn't think now (in 1973) that he would have made the transaction in August 1963 if he had seen exhibit 6, a letter from Frederick S. Todman to Alphaeus C. Beane dated January 8, 1963. He says he learned of this letter in 1972. The nub of the letter was the recommendation from the accountant that the title to the collateral, the regularity of the warehouse receipts and insurance coverage be ascertained and the opinion that the Allied account as then constituted was too large in proportion to the capital of W &B and that the spot commodity account of Allied should be eliminated. The letter in question is quoted in the appendix hereto.

If W&B had done nothing about the accountant's comments and if the status of the accounts had remained the same until August 1963, non-disclosure thereof to an investor in the firm could have been considered a warning that was recklessly disregarded and could conceivably mount charges under Section 10(b) and Rule X–10b–5 under the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.-10b–5, and perhaps even under the common law. But that is far from fact in this case and any such underlying hypothesis distorts the fact pattern in Au-

gust 1963 and puts out of focus the events which occurred.

There was a prompt and decisive response by W&B's predecessor to the questions raised by the January 8th letter.

All of the things that Todman wrote about in the January 8th letter were promptly considered and investigated and action was undertaken thereon within a brief period. The circumstances had changed radically by August when plaintiff became a subordinated lender —there no longer were any outstanding unexplained or uncorrected situations. Counsel was promptly consulted by W&B on the legal aspects of Todman's suggestions. A check was made with Continental Illinois Bank to see if there was any irregularity in the fact that the same typewriter seemed to be used on the Amex warehouse receipt and that of Harbor Tank Storage. Inquiry was made as to the feasibility of isolating and earmarking the oil serving as collateral. On this the response of the bank —which was itself a lender to the customer on identical warehouse receipts— was that it preferred to treat the security as fungible. This seemed rational and sensible. Since the soybean oil involved was a fungible chattel commonly warehoused in tanks which pooled oil being held for more than one depositor, the provision of the United States Warehouse Act, 7 U.S.C. § 258, requiring segregation of separately owned chattels, was reasonably thought not to apply. Following up further on the auditor's comments, the Roberts loans were eliminated and a program to scale down the Allied accounts and the indebtedness therein was promptly discussed with De Angelis and agreed upon and a confirmatory letter expressing the understanding was sent to De Angelis on January 14, 1963. In sum, W&B obtained a satisfactory response on the Todman comments as to (1) insurance coverage, (2) applicability of the collateral to the

---

3. "[M]ateriality must be determined on a case-to-case basis according to the fact pattern of each specific transaction." Radia-

tion Dynamics, Inc. v. Goldmuntz, 464 F.2d 876, 888 (2d Cir. 1972).

account carrying the margin loan, (3) the absence of irregularity as to the use of the same typewriter on receipts, (4) the preference of the concept of fungibility of the oil to segregation of the quantities for use as collateral, (5) the absence of access to the oil by Allied and (6) the biweekly inspection by American Express Field Warehousing of the tanks to see if the oil was there and the periodic confirmation thereof under standard procedures from January through November 1963 asserted by the warehouse corporation.

Conforming to Todman's suggestion and the prompt agreement thereto by De Angelis, the loan on the commodity account was shrunk from over $3 million to approximately $1.1 million in reasonably short order by repayments from Allied, made voluntarily. It was agreed that the account would be removed by December 1963. It was an account profitable to W&B and its elimination was to be phased out and not abruptly ended. Concurrently the number of futures contracts carried for the account was drastically reduced and limited and the account kept within the limits so reached. These limits were regularly reported to the New York Stock Exchange. The proportions at which the spot and futures accounts were maintained after the action described above were reasonably sized considering the business and the capital of the firm. W&B felt all during 1963 that the firm was adequately secured by the warehouse receipts for the spot oil and the margin in the futures account which was kept marked to the market continually.

Significantly, on January 21, 1963, Todman had unequivocally and unqualifiedly reported in writing to W&B that

We are pleased to advise you that unqualified confirmation was established in respect of stored oil, but the same degree of verification was not obtained regarding Bills of Lading.

The Court finds that W&B and Beane and Kantor and Marsh were not aware or on notice of any question as to the value of the warehouse receipts or the nonexistence of the oil represented thereby and that they reasonably did and could rely on the unqualified confirmation of the accountants and of American Express Field Warehousing given in good faith in respect thereto. There was no contemporaneous material fact known to any of them which W&B or Marsh omitted to disclose to Mittendorf at the time of his loan in August 1963. "Material information simply consists of facts which may affect the desire of reasonable investors to buy, sell or hold a company's securities . . . ." and as an index, but not a test thereof, "[a] major factor in determining whether events are material is the importance attached to them by those who knew about them." Securities and Exchange Commission v. Shapiro, 349 F.Supp. 46, 53, 54 (S.D.N.Y.1972), citing Securities and Exchange Commission v. Texas Gulf Sulphur Co., 401 F.2d 833, 851 (2d Cir. 1968) (en banc), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). In any event, "only the essence of a point need be disclosed, not the minute details." Jacobs, What is a Misleading Statement or Omission Under Rule 10b–5?, 42 Fordham L.Rev. 243, 256 (1973).

Accordingly, by August 1963, the inquiries voiced by the Todman letter were, at most, only of historical interest. They were no longer viable, extant concerns of W&B; each had been resolved to the full and complete satisfaction of not only W&B, but of its counsel and bankers as well. In fact, even Todman —the very man who voiced the concern originally—manifested his satisfaction. No one believed these questions would have any future impact on W&B; nor could any other conclusion reasonably have followed. Only through the indulgence of the rankest form of hindsight analysis could this Court now seize upon the fortuitous happenstance of the subsequent collapse of the De Angelis empire due to the nonexistence of the very oil about which Todman had expressed different—and unfounded—concerns as a basis on which to predicate a finding

of continued viability, and hence materiality, of the Todman letter's concerns as of August 1973. *Cf.* Securities and Exchange Commission v. Texas Gulf Sulphur Co., 258 F.Supp. 262, 284 (S.D.N.Y.1966), aff'd in part, rev'd in part, 401 F.2d 833 (2d Cir. 1968) (en banc), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), quoting Value Line Fund, Inc. v. Marcus, CCH Fed.Sec.L. Rep., ¶ 91,523, at 94,956 (S.D.N.Y.1965). As of a date well prior to that time, any doubts caused by the letter had been investigated and resolved; no one believed that any further problem existed—nor was there any basis for such belief.

The situation may be viewed from yet another aspect.

Marsh acted in good faith in suggesting the August loan; there is no credible evidence or inference to the contrary. Plaintiff's testimony underscores this point. He expressly exonerated Marsh from any suggestion of dereliction. Their relationship had strong roots in the past. Giving effect to the realities, he may factually and rationally also be deemed to have been plaintiff's agent in respect to the loan as well as the agent of W&B Inc. Neither W&B nor Marsh gained any untoward advantages from the transaction.

■ If he was plaintiff's agent, the historical knowledge of Marsh in respect to the Allied accounts and the Todman letter was clearly imputable to plaintiff. No implication or inference of deceit or concealment can properly be drawn from the evidence. Marsh was, of course, fully informed in the premises—including the supervisory inquiries of and reports to the New York Stock Exchange which indicated no criticism or suspicion of improper business conduct at any time. Actual knowledge of plaintiff was unnecessary under the facts and circumstances here present to impute Marsh's knowledge to him. The notice to and knowledge of Marsh were clearly within the scope of the agency entrusted to him by plaintiff and this is so in the special circumstances here present, notwithstanding any diversity of interest on Marsh's part. The mere fact that Marsh may have acted for both parties in effecting the loan, with plaintiff's knowledge, cannot insulate the plaintiff from his agent's knowledge to the detriment of Williston & Beane, Inc. Any criticism if the wisdom of consummating the transaction in the face of the facts developed herein does not justify the conclusion that Marsh's decision to proceed on plaintiff's behalf was actuated by bad faith—and the Court finds that it was not. *See* Wolf v. Lovering, 159 F. 91, 86 C.C.A. 281 (2d Cir. 1908); Lawrence Leather Co. v. Norton Lilly & Co., 15 F.2d 101 (S.D.N.Y.1926).

■ The rule of law is clear that where special facts warrant the inference, as here, that the principal knows that his agent is also acting for the party adversely interested in the transaction, and yet consents to let him act as his agent, the principal is estopped from denying notice and knowledge which the agent had during the negotiation. Pine Mtn. Iron & Coal Co. v. Bailey, 94 F. 258, 36 C.C.A 229 (8th Cir. 1899).

The point in this case is that the knowledge of the manner in which W&B was conducting its business with a principal commodities customer of many years standing presented only a matter of business judgment to the brokerage firm and it was a rational and honest judgment for Marsh to invest in W&B for plaintiff precisely in the same manner as Marsh and his wife were doing for themselves. Even after it was known that the tanks were devoid of oil, plaintiff was not worried, he said, because American Express was 'behind the warehouse receipts.' With equal reason the partnership and W&B were entitled to like equanimity in viewing the prima facie ample collateral for the commodity accounts.

■ Knowledge of the Todman letter of January 8, 1963 would not have deterred a reasonably prudent investor from making a subordinated loan to W&B in August 1963 such as that made

by Mittendorf, considering what had occurred in the interim. On this record, it would be improper to infer as a fact that the existence, extent and W&B's conduct of Allied's accounts and their collateral as of August 1963 would reasonably raise any question or deterrence for a prospective prudent investor of senior subordinated loan capital.

## V.

The defendants have asserted that the applicable statutes of limitation bar the claims asserted herein.

■■ The statutory period for the assertion of a claim under § 17(a) of the Securities Act of 1933 or Section 10(b) of the Securities Exchange Act of 1934 appears (Fischman v. Raytheon Mfg. Co., 188 F.2d 783, 787 (2d Cir. 1951); cf. Hornblower Weeks-Hemphill, Noyes v. Burchfield, 366 F.Supp. 1364, 1368 (S.D.N.Y.1973)) to be the applicable state [4] statute of limitations for claims of fraud (N.Y.C.P.L.R. §§ 203(f), 213(9), McKinney's Consol.Laws, c. 8),

viz., within two years from the time plaintiff discovered, or could with the exercise of reasonable diligence, have discovered, the fraud or within six years of the fraud itself, whichever is later. Klein v. Shields & Co., 470 F.2d 1344, 1346 (2d Cir. 1972); Klein v. Auchincloss, Parker & Redpath, 436 F.2d 339, 341 (2d Cir. 1971); cf. Hoff Research & Development Laboratories, Inc. v. Philippine National Bank, 426 F.2d 1023, 1025–1026 (2d Cir. 1970). This rule must be read against the caveat that the statutory period commences when constructive knowledge of sufficient facts to recognize fraud can be imputed to the plaintiff or his counsel and "[does] not await [his] leisurely discovery of the full details of the alleged scheme." Klein v. Bower, 421 F.2d 338, 343 (2d Cir. 1970); see Sielcken-Schwarz v. American Factors Ltd., 265 N.Y. 239, 245–246, 192 N.E.2d 307, 310 (1934); Augstein v. Levey, 3 App.Div. 2d 595, 598, 162 N.Y.S.2d 269, 273 (1st Dep't. 1957), aff'd mem., 4 N.Y.2d 791, 173 N.Y.S.2d 27, 149 N.E.2d 528

4. Although most Courts confronted with the problem have, without discussion, selected an applicable state statute of limitations in federal securities litigation predicated on Rule 10b–5, the question of what period of limitation to apply is one of federal law. Cf. International Union v. Hoosier Cardinal Corp., 383 U.S. 696, 701, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966).

In fashioning periods of limitation for federally-based claims for relief which carry no specifically applicable statute of limitation, federal courts have traditionally refrained from judicial creation of fixed periods of limitation and have looked for "analogous" statutes, that is, statutes applicable to similar causes of action. See, e. g., McAllister v. Magnolia Petroleum Co., 357 U.S. 221, 78 S.Ct. 1201, 2 L.Ed.2d 1272 (1958); Holmberg v. Armbrecht, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946); Charney v. Thomas, 372 F.2d 97 (6th Cir. 1967); Parrent v. Midwest Rug Mills, 455 F.2d 123 (7th Cir. 1972); Vanderboom v. Sexton, 422 F.2d 1233 (8th Cir.), cert. denied, 400 U.S. 852, 91 S.Ct. 47, 27 L.Ed.2d 90 (1970).

The Federal Securities Laws did not expressly provide for any private civil remedies for violations of Section 10(b) or Rule 10b–5. Such remedies were created at a lat-

er time by judicial implication. See, e. g., Osborne v. Mallory, 86 F.Supp. 869, 879 (S. D.N.Y.1949). When the Federal Securities Laws were enacted, there was no private civil action under Section 10(b) or Rule 10b–5 to which a period of limitation could apply.

Common sense and logic dictate that application of the period of limitation contained in the 1933 and 1934 Acts to 10b–5 claims would be preferable as a matter of Federal Securities Laws policy.

The American Law Institute recodification of the Federal Securities Laws apparently contains a federal statute of limitations applicable to Rule 10b–5 claims. Loss, The Current Status of S.E.C. Codification, 26 Bus.Lawyer 555, 558.(1970).

The pertinent admonition of Judge Learned Hand that it is not "desirable for a lower court to embrace the exhilarating opportunity of anticipating a doctrine which may be in the womb of time, but whose birth is distant," Spector Motor Service, Inc. v. Walsh, 139 F.2d 809, 823 (2d Cir. 1944) (dissenting opinion), deters this Court from grounding its holding herein on the notion that a uniform period of limitation should be applied, although if applied here, the result would be identical.

(1958); Ectore Realty Co. v. Manufacturers Trust Co., 250 App.Div. 314, 318, 294 N.Y.S. 96, 100 (1st Dep't. 1937).

The events to which this suit is directed occurred in early 1963. Consequently, even if this suit be viewed as embracing a fraud claim to which the six year limitary period would be applicable, suit was barred from 1969 or within two years from the time plaintiff discovered or could with the exercise of reasonable diligence have discovered the possibility of the fraud asserted, whichever time is later. This suit was filed on July 26, 1973. There is ample evidence from which to conclude that plaintiff knew or could have known of "at least the possibility of fraud" Klein v. Shields & Co., 470 F.2d 1344, 1347 (2d Cir. 1972), well prior to July 26, 1971. [more than two years before suit filed].

In January 1963, the Todman letter gave notice to W&B that the auditor was suggesting confirmation of the sufficiency of the firm's documentary title to collateral, the propriety of the insurance coverage, and the genuineness of the warehouse receipts. Todman also commented on the volume of Allied's transactions and commitments and the quantity of the broker's loans to this customer, suggesting that these might have become overextended in relation to the firm's capital and in some respects resembled banking rather than brokerage transactions, implying that these posed dangers to the firm's capital and thus its continuance if anything went amiss.

By the end of 1966 the plaintiff and his attorney, Ryder Henry, Esq., and particularly his confidant and broker, Norman J. Marsh, were sufficiently put on notice of all of the foregoing or at least were on notice to inquire further in respect to the maintenance, scope and conduct of the Allied accounts and of the reports and views of W&B's auditor in respect thereto.

Subsequent to the events of November 1963, plaintiff, represented by Ryder Henry, Esq. and Norman J. Marsh [no longer connected with W&B] joined in the extensive discussions and negotiations among and between, *inter alia,* W&B, its principals, its subordinated creditors, and others believed to be potentially interested in the premises. One of the objects of this collaboration was the distribution of any assets, *pari passu,* which might come into the possession of W&B (*e. g.,* from American Express Field Warehousing). No customers of W&B were involved in these negotiations, as no customers had incurred any loss whatsoever; all customer claims against W&B were paid in full.[5]

All parties involved in these and other related discussions were at all times represented by highly skilled, vigorous counsel. The prospect of ultimate recourse to litigation was never far from anyone's mind throughout these talks. Several actions were threatened, and some were actually commenced, including one in 1965 by one Baxter and one in 1966 by one Maher. Prior to their filing, drafts of these, and possibly other, complaints—including one prepared by counsel for the estate of one Rudkin in 1965—were circulated among the various counsel representing the various subordinated lenders, including Mr. Henry. In essence, the Baxter, Rudkin and Maher complaints set forth claims of alleged securities fraud predicated on alleged misstatements or omissions of material facts at the time of investment. As is the nature of such pleadings, they were drawn with a broad brush. All

---

5. Although the collapse of Ira Haupt & Co. and the subsequent deluge of customer claims litigation—growing out of the same salad oil scandal—was in part responsible for the enactment of the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa–78*lll, see* H.R.Rep.No.91–1613, 91st Cong., 2d Sess. 1–4 (1970), in 3 U.S.Code Cong. & Admin. News 5254, 5256–5257 (1970), W&B never faced such problems; it was able to satisfy all customer claims in full. However, its principals, including Beane and Kantor, lost their entire investment. Beane's loss alone was monumental.

used a boilerplate 10b–5 allegation self-evidently designed to avoid any variance with any proof later adduced at trial. A fraud complaint requires *some* knowledge of wrongdoing as a predicate for its filing, Segal v. Gordon, 467 F.2d 602, 607–608 (2d Cir. 1972); Spiegler v. Wills, 60 F.R.D. 681 (S.D.N.Y.1973). It is a fair inference that the various investors, collectively, had some notice or knowledge or strong basis for belief as early as 1965 that an alleged fraud had been committed. In 1965, Mr. Henry read the Rudkin complaint containing a direct charge that Williston had accepted warehouse receipts as collateral for the Allied account that were "under a cloud" and were of "questionable value" and "could not be realized upon" and that Beane had "failed to disclose" this. Henry testified that he was in close touch with the lawyer who drafted that complaint and had interrogated Norman Marsh about this matter. The Todman letter itself came to light, according to plaintiff's account, during discovery proceedings in the pretrial stages of the Maher litigation—which was, of course, founded on the 1966 complaint. (Of course, Marsh knew about the letter in January 1963). Accordingly, it is apparent that a date no later than November 2, 1966—the date of the filing of the Maher complaint—is "that point in time [at which], at least the possibility of fraud should have been apparent to [plaintiff]; and the opportunity to inquire further, by taking [depositions], of course was available." Klein v. Shields & Co., 470 F.2d 1344, 1347 (2d Cir. 1972).

There was no dearth of aroma of fraud swirling around of which Marsh, Henry and the plaintiff could not help being aware. Tino De Angelis was indicted on December 23, 1963 and the wide notoriety of the case did not escape the press which plaintiff read. Mittendorf made known his intention to commence litigation to establish the priority of his claim over those of subordinated creditors. Mr. Henry testified that, after the swindle was uncovered, he was

aware that the warehouse receipts were fraudulent—a fact he clearly could not deny. However, he maintained in his testimony that he believed that W&B had no prior knowledge of this fact—a belief he continued to hold, he said, until the disclosure of the Todman letter during the pretrial stages of the Maher litigation. In essence, Mr. Henry says that, until sometime after July 1971, he classed W&B with the victims; and only after discovery of the Todman letter by Maher's counsel did he shift W&B to the victimizer's column. This testimony does not square with the extension of the limitary period to sue which he negotiated and procured in 1966; and on the basis of all the circumstances, background and facts, as well as the demeanor evidence, is not credited by the Court. The Court is satisfied that plaintiff with reasonable diligence could have discovered the alleged fraud long prior to July 1971.

It is enough that plaintiff had such notice of the facts as would impel a reasonable man in his position to make inquiry. Having such notice, he will be chargeable with knowledge of all the facts which inquiry would disclose. The discovery of fraud is either the date of actual discovery or the date on which the plaintiff in the exercise of reasonable diligence should have made discovery. Holmberg v. Armbrecht, 327 U.S. 392, 397, 66 S.Ct. 582, 90 L.Ed. 743 (1946); Bailey v. Glover, 21 Wall. 342, 88 U.S. 342, 348, 22 L.Ed. 636 (1874). This objective approach has been uniformly applied by the Courts in actions brought under both the 1933 and 1934 Securities Acts. Azalea Meats, Inc. v. Muscat, 386 F.2d 5, 8 (5th Cir. 1967); Goldenberg v. Bache & Co., 270 F.2d 675, 681 (5th Cir. 1959).

Although reluctance on the part of an attorney to resort to 10b–5 litigation absent some factual basis therefor is highly commendable, *compare* Lewis v. Varnes, 368 F.Supp. 45 (S.D.N.Y.1973), that is not to say that the Court will condone and reward professional inertia in the face of, at a minimum, an over-

whelming indication and need for further investigation and inquiry. *A fortiori,* where other counsel similarly situated have already resorted to timely litigation.

At all events, there came a point in time—*viz.,* 1968—when plaintiff knew enough about the nature of his potential claim to settle and release the same. The validity of the release will be discussed separately below; at this point it suffices to note that plaintiff, counseled by his attorney, and assisted by Marsh who was on the inside from the first, felt he knew enough about the nature of his claim to demand—and receive—a substantial settlement in consideration of his releasing it.

■ To rescue himself from the operation of the applicable (New York) statute of limitations, plaintiff seeks to invoke "the federal equitable tolling doctrine. Bailey v. Glover, 21 Wall. 342, 88 U.S. 342, 22 L.Ed. 636 (1875)." In essence, this doctrine provides that where a defendant against whom a federally created claim for relief is pleaded conceals the wrong alleged, the running of the applicable statute of limitations will be suspended for the duration of the period of the concealment. Moviecolor Ltd. v. Eastman Kodak Co., 288 F.2d 80, 82 (2d Cir.), cert. denied, 368 U.S. 821, 82 S.Ct. 39, 7 L.Ed.2d 26 (1961). The benefit of the doctrine is available to a plaintiff notwithstanding the fact that under a "borrowed" state statute of limitations the period may run from the date of perpetration rather than the date of discovery. Saylor v. Lindsley, 302 F.Supp. 1174, 1180–1181 n. 12, 1183–1184 (S.D.N.Y.1969). It is applicable to 10b–5 actions. Klein v. Spear, Leeds & Kellogg, 306 F.Supp. 743, 748–749 (S.D.N.Y.1969), and 309 F.Supp. 341, 343 (S.D.N.Y.1970). *See generally* Parrent v. Midwest Rug Mills, Inc., 455 F.2d 123 (7th Cir. 1972); deHaas v. Empire Petroleum Co., 435 F.2d 1223 (10th Cir. 1970); Vanderboom v. Sexton, 422 F.2d 1233 (8th Cir.), cert. denied, 400 U.S. 852, 91 S.Ct. 47, 27 L.Ed. 2d 90 (1970); Janigan v. Taylor, 344 F.2d 781 (1st Cir.), cert. denied, 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965).

■ However, as applied to the facts disclosed herein, no toll is warranted. There is no showing that defendants in any way attempted to or did conceal any of the facts alleged, including the Todman letter. *See Moviecolor, Ltd., supra.* If anything, the evidence tends to indicate that the defendant Beane was open and forthright in his statements on the matter to all of his partners, including Marsh, and before the Department of Member Firms of the New York Stock Exchange on December 20, 1963. He revealed not only the existence of the Todman letter, but also the steps taken by W&B in respect thereto. In short, there was no "cover up"—the currently popular phrase which is inaptly imported here by plaintiff.

The credible evidence sufficiently establishes that no one connected with W&B or its auditors knew or suspected that the warehouse receipts were fraudulent and were not backed up by oil, until about December 1963.

The defense that the claim is time' barred has been sustained.

## VI.

The defense of release evokes the following further considerations.

After lengthy negotiation, an agreement dated July 8, 1968 was executed by and among W&B, Walston & Co., Inc., plaintiff, and certain other subordinated creditors of W&B under which each party settled his claims and released each and every other party and all officers and directors of the defendant corporation[6] in their capacity as such from all claims arising out of "any matter related directly or indirectly to dealings with Williston." The release agreement signed by plaintiff recites his manifested intention to commence litiga-

---

6. Except Beane, who received a separate release from plaintiff.

tion if the agreement was not reached. As additional consideration for the compromise, the then pending Baxter litigation was to be dismissed with prejudice.[7]

■ The release by plaintiff was intelligently and deliberately made. It was the product of lengthy negotiation by competent counsel. It was made at a time when plaintiff had actual knowledge or could, upon reasonable inquiry, have discovered all the facts he now alleges. Furthermore, it was made at a time when two separate litigations (*Baxter, Maher*) against, *inter alia*, substantially the same defendants (except the accountants) and involving substantially the same allegations were already in progress in this Court. Unless some public policy forbids its enforcement, the release, by its terms to be construed in accordance with New York law, is—as a matter of contract law—effective to bar the instant claim.[8]

■ Plaintiff contends that § 14 of the 1933 Act and § 29(a) of the 1934 Act "prohibit the *waiver* of liabilities created by the securities laws," (emphasis added), citing Colonial Realty Corp. v. Bache & Co., 358 F.2d 178 (2d Cir.), cert. denied, 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966). Although the relationship of the cited case to the stated principle is wholly obscure, that principle—whatever its merits or origin may be—is by its terms inapplicable to the facts herein which show a *release* of a matured claim as opposed to an anticipatory *waiver* of any claim which might arise later.

Similarly, plaintiff has misconstrued the question here in his citation of

Judge Frankel's dictum in Schine v. Schine, 254 F.Supp. 986, 988 (S.D.N.Y. 1966), to the effect that "[i]t would be at least highly anomalous . . . to hold under section 29(a) that a party, without knowing the facts, could effectively bar himself by a release from suing for fraud *in the transaction of which the release was part*." (emphasis added). The language is clearly inapplicable to the situation herein—here plaintiff complains of a 1963 transaction; defendants assert a 1968 release. *Haec reputant, videbunt.*

Plaintiff further relies upon In re Cohen's Will, 51 F.R.D. 167 (S.D.N.Y. 1970) (general arbitration clause in contract for sale of securities invalid as waiver "in futuro" of *potential* rights); Pearlstein v. Scudder & German, 429 F. 2d 1136 (2d Cir. 1970), cert. denied, 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550 (1971) (stipulation by which plaintiff-customer acquiesced in defendant-broker's *continuing* violation of federal margin requirements held void); and Cohen v. Tenney Corp., 318 F.Supp. 280 (S.D.N.Y.1970), quoting extensively from the latter. Suffice it to note that the "release" asserted therein which drew forth Judge Tyler's "[j]udicial hostility toward waivers [which] generally requires that the right of private suit for alleged violations be scrupulously preserved against *unintentional or involuntary* relinquishment," 318 F.Supp. 284 (emphasis supplied), consisted of an endorsement *affixed by the maker* to checks sent by the defendants to the plaintiffs[9] at a time when, although a controversy had arisen, no litigation had

---

7. No mention is made of the then pending Maher litigation in the 1968 agreement. However, this is readily explained by the fact that it was an agreement by and between subordinated creditors of W&B, while Maher was a stockholder of W&B. Parenthetically, Judge Lumbard's decision in *Maher* (subsequently vacated by stipulation) was based on a factual record wholly dissimilar from that at bar. The primary distinctions concern the proof in *Maher* of affirmative misstatements as to the results of the firm's operations and its financial condition.

8. Plaintiff has also asserted that the release suffers from a lack of consideration. This argument—wholly without basis in fact—in any event ignores N.Y.G.O.L. § 15–303, McKinney's Consol.Laws, c. 24–A, which declares that "[a] written instrument which purports to be a total or partial release of all claims . . . shall not be invalid because of the absence of consideration or of a seal."

9. Thus, an endorsement of the check also acted as a signature of the release. *Id.* at 281.

been commenced by any party. Plaintiff's other citations are equally inapposite to the case at bar, where the release at issue was voluntarily, intelligently and knowingly made by well counseled parties well aware of their litigation options. In fact, on reargument, the *Cohen* Court specifically repudiated a part of its prior opinion and recognized that "[a] general release, purporting to settle an already ripened controversy, is not by its terms void as a matter of law." *Id.* at 284. Moreover, the same Court on reargument also expressly construed *Pearlstein, supra,* as "not [importing] that all settlements of matured claims, short of litigation, are void; but rather that their terms are not necessarily above juicial scrutiny . . . .' *Id.*[10]

No rational basis has been suggested for depriving private parties of the right to acquit one another, retrospectively, of liability under open circumstances, whether the liability stems from conduct actionable under § 10(b) of the 1934 Act and its progeny or any other federally created right. Such liability, once matured and recognized, is susceptible of valid and binding release. To hold otherwise would be to thrust the Court into the business decisions of litigants *inter se* and to compel each party, regardless of his desires or the practicalities of the situation, to wage his law in the arena, for surely the next step would be to argue that, just as parties may not compromise claims by release, so they may not compromise claims by extrajudicial settlement. Any such argument must of necessity fall of its own weight.

■ There remains plaintiff's claim that, even if public policy does not forbid the release of a securities fraud claim, this particular release should be set aside as having been procured by fraud. *E. g.,* Mangini v. McClurg, 24 N.Y.2d 556, 301 N.Y.S.2d 508, 249 N.E. 2d 386 (1969). No credible proof whatsoever has been offered that indicated fraud in the procurement or in the execution of the release. All parties were ably represented by counsel; the negotiations were at arm's length, far ranging and of great duration; and, most importantly, the damage was obvious, and clearly appreciated by all sides. The release was validly obtained and executed. Moreover, the consideration which plaintiff obtained for his release was substantial—in point of fact, he ultimately received more under the provisions of the arrangement worked out in conjunction with the release than he originally invested in W&B.

■ There being no reason to disregard or set aside the release,[11] reference to the terms thereof must be had in order to determine whether it serves to bar the instant claims. The operative language of the release states that it applies to "all claims and demands whatsoever . . . related directly or indirectly to dealings with Williston." In enforcing a general release virtually identical to the instant one, the New York Court of Appeals in Lucio v. Curran, 2 N.Y.2d 157, 161–162, 157 N.Y.S. 2d 948, 952, 139 N.E.2d 133, 136 (1956), stated that

Such words of general release are clearly operative not only as to all controversies and causes of action between the releasor and releasees which had, by that time, actually ripened into litigation, but to all such issues which might then have been adjudicated as a result of pre-existent controversies. . . .

10. Accordingly, the Court denied summary judgment on the ground of release, without prejudice to a subsequent renewal of the motion.

11. Plaintiff himself was willing to stand by the terms of the release and the related agreement as recently as July 1973—well after his discovery of the Todman letter—when he accepted securities having substantial cash value pursuant to the terms of the 1968 agreement. Clearly the retention of benefits under the release is inconsistent with an attack thereon as having been fraudulently procured.

Plaintiffs' claims herein, arising as they do out of a controversy pre-dating the execution of the release, might have been adjudicated at the time of its execution. Instead, plaintiff made an intelligent and knowledgeable choice to forego litigation in favor of compromise. His execution of a valid release bars his claims herein.

### VII.

Plaintiff's claims—both federal and pendent—are barred both by limitations of time and by release. Moreover, plaintiff has failed to prove a violation of the anti-fraud provisions of the federal securities laws.

The complaint and each Count thereof is dismissed on the merits, with a separate bill of costs to each defendant separately represented, together with disbursements incurred, to be taxed by the Clerk.

The foregoing shall constitute the findings and conclusions required by Fed.R.Civ.P. 52(a).

So ordered.

### APPENDIX

*Exhibit 6*

January 8, 1963

Mr. Alpheus C. Beane
2 Broadway
New York 4, N.Y.

My dear Alph:

Additional crude soybean oil had been received into the accounts of Allied and Roberts Food Corporation in answer to your calls for cash margin. For the first account, 8,000,000 pounds had been provided, representing, at the price of .0975¢, approximately $780,000. It was covered by an "original non-negotiable warehouse receipt, number B 2073, issued on December 24, 1962 by Harbor Tank Storage Co., Inc. Attached thereto was a letter issued by William Stake and Company, Inc., insurance brokers and average adjusters, purporting to protect your interests in the property. The termination date inscribed in the letter is Febuary 8, 1963, at noon, E. S.T.

May we properly assume that the term "loss" includes *theft, fire* and *other hazards* to which the warehouse property may be subjected. I would urge that your independent carriers pass upon the adequacy of the insurance coverage, more particularly in view of the fact that no official policy had been issued to you to spell ou[t] full protection. I am unaware that William Stake and Company have the authority to bind the underwriters whom they list.

Under Warehouse Receipt D 50867, dated December 26, 1962, the American Express Field Warehousing Corporation issued a non-negotiable document covering 4,310,000 pounds of crude degummed soybean oil, whose value at .0975¢ per pound came to $420,225. Again, William Stake and Company, Inc. issued their verification letter of insurance, dated December 26, 1962. The expiry is February 8, 1963.

What is unusual about the matter is that the oil was entered by you into the account of the Roberts Food Corporation as collateral against their open futures commitments, and that the warehouse receipt names Roberts in that document. And yet, the Stake letter indicates that Allied has this oil covered by *their* insurance. If it is Roberts Oil, assigned to you for your protection of their open contracts, then why should Allied be named as the primary party in the coverage. Is it possible that Allied and Roberts are one and the same entity? Whose oil is it—Allied or Roberts? What right of disposition by sale or otherwise, vests in your Firm. This is a legal matter on which competent Counsel's opinion should be promptly obtained.

It is worthy of note that both the American Express Field Warehousing

Corporation, and the Harbor Tank Storage Company, Inc., state that the oil is stored "at: Foot of East 22nd Street, Bayonne, N.J.", the address of Allied; that the same typewriting machine appears to have been used in the preparation of these documents; that no allocation of the property appears on the warehouse receipts. Is this a co-incidence? Does Allied have access to the oil without your permission through pipeline facilities? Should not all withdrawals or removals be made with your written approval, and endorsed on the warehouse receipts, all of which is customary and usual? I am *completely* perplexed by the circumstances recited herein.

I beg you to have your *own* insurance company send their expert to the warehouse to determine if your oil has been segregated in accordance with the Federal Warehousing Act; that your legal Counsel begin *immediate* proceedings against Allied and Roberts for the recovery of the advances made by you to them. Forgive me for saying so, but I would rather lose their patronage than lose the money related to the accounts.

Both Allied and Roberts have open futures. A break in the market must be met through your cash remittances on the clearing association sheets; crude soybean oil cannot be substituted as variation margin.

Please refer to entries in the account of Allied between December 3 and December 6, where through the medium of journal transfers Allied had apparently purchased cash cotton seed oil from Roberts, Seymour Hyman, and Omer Corporation. While payments were made by Allied for these purchases, it poses the question of a possible "tie-in" among these parties, and a further question as to why cash, rather than soybean oil collateral, is not remitted to you in answer to margin calls.

I should be remiss in my duties not to call these incidents to your attention.

It is my studied opinion that the sooner you dispose of all "spot" oil, the better it will be for your business peace of mind. I repeat that you are performing banking, rather than brokerage, functions to which operations I cannot freely subscribe.

My best to you.

Sincerely,

/s/ Fred.

FST/rs